UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

TIMOTHY J. RIZZO,

                      Plaintiff,

v.                                           CIVIL ACTION NO.: 6:15-CV-00557

GLOBALFOUNDRIES, U.S., INC. and
APPLIED MATERIALS, INC.,

                      Defendants.
-------------------------------------------------------------------x

STATE OF NEW YORK       )
                                       ) ss:
COUNTY OF SARATOGA     )

        Timothy Rizzo, being duly sworn, deposes and says that:

        1.      I am the Plaintiff in the above-entitled action.

        2.      I began working for M+W Group on July 6, 2009.  The M+W Group was involved in the development and the construction of Globalfoundries in Malta, New York (hereinafter referred to as the "Globalfoundries site").

        3.      Specifically, I was involved in the development and the building of the Fab8 facility.  While working for the M+W Group my job responsibilities included being in charge of the site outskirt buildings and the entire land development at the Globalfoundries site.

        4.      As a Licensed Engineer, I was the main person to assure that all other trades and managers were able to build and construct as well as receive utilities and materials.  The parcel of land at which Globalfoundries was built on is sand.



5. My first office location at the Globalfoundries site was located in the Malta Rocket Fuel Area (MRFA). The water used at the old MRFA facilities was surface water (artificial pond), which was contaminated and not potable. I believe this was because the artificial pond was located next to the rocket launch pads and untreated. Additionally, there were many military outskirt buildings which were storage areas for past chemicals and weapons.

6. My office was eventually moved approximately 400 feet from the rocket launch pads and the building was placed on a slab in the MRFA.

7. Over time as the development continued, the MRFA was then excavated exposing barrels of toxins in the soil including hydrocarbons and heavy metals. Examples of hydrocarbons and heavy metals include TCE, PCE, Carbon Tetrachloride, Chromium, Lithium Hydride, Arsenic, Mercury, Hydrazine and rocket fuel. These exposures are detailed in the CT Male report dated August 2, 2011 [Exhibit "D"], the Chemical List [Exhibit "E"], the EPA Superfund Record of Decision [Exhibit "F"] and information provided by the EPA with respect to TCE [Exhibit "G"].

8. This Globalfoundries site is 146 +/- acres large and I was the Civil Construction Site Manager/Civil Engineer (under M+W Group) and allowed building construction to commence. The site is a <u>Superfund Site</u> and there were many limitations. It was a former Military Rocket Test Facility and is comprised of silt and sand. Throughout the entire building process these materials were disturbed such that any contamination within the silt and sand was also disturbed. None of these soils left



the site because of, as I understood it, liability reasons, which included the possibility of contaminating other properties.

9. The Operations Office was built directly adjacent to the discovered barrels as it was constructed prior to knowing the barrels were within proximity. I was in charge of managing the site grounds and all our stock supplies with Delaney Construction which were located within that area and it was an active storage area.

10. The barrels were in direct proximity - yet underground. The Operations Office, as I understand it, is still part of the MRFA and the soils we had there could not be moved.

11. The construction of the Parking Lot D which is located in the MRFA took approximately 2-years to be completed due to extensive remediation that needed to be completed to reduce and/or eliminate the exposures. These toxic soils were relocated in another area of land within the MRFA and capped under the direction of CT Male. Construction and excavations of the MRFA was conducted by LaChase.

12. LaChase found the barrels of chemicals within the MRFA and DEC / Hazmat was notified. This finding is recorded in the CT Male Report.

13. The chemicals were not only in solid or liquid form but were airborne as VOC's, SVOC's, or dust from all of the construction activity taking place, including surface water runoff from the MRFA which was contaminated.

14. In January 2010 my office was moved into the Filed Operations Office as M+W Group abandoned the former military building. When the Fab 8.1 building was



completed I frequently performed various duties within the building. It was normal protocol for me to do safety walks through all of the buildings including Fab 8.1 and or to assist other Construction Managers.

15. During the entirety of the construction of this facility I was exposed to dust, fumes, vapors, and particles. While the majority of my work was in the field office located in the MRFA, on average, I would visit the field or the buildings about twice a day for 2 hours and at times longer.

16. One large exposure of contamination was located at the South Pond which is within 200 feet of the Operations Office in the MRFA. This pond is a point of runoff for the MRFA and Parking Lot D.

17. Other sources of contamination can be traced to the wind blowing contaminated and disturbed soils from west to east that I and others inhaled, as well as, evapotranspiration from the soils and ponds.

18. During the spring of 2011 tool installation began in Fab 8.1. This means that the factory was preparing for production TOOLS and the beginning of a long build process. In essence, the factory was beginning its startup phase. Process piping and chemicals were being installed and the facility was being charged.

19. While working within Fab 8.1, I was exposed to welding fumes and VOC's from floor epoxies and paints. In addition, none of the issues with regard to the South Pond or contaminated soils had been resolved. As such, my exposure to the toxins in the South Pond and soils continued.



20. On or about January 13, 2012, I was laid off from my position with M+W Group.

21. On May 2, 2012 I began working for AM Technical Solutions (hereinafter referred to as "AMTS") as a head Tool Install Construction Manager (CM). As one of the head Tool Install Construction Managers, I was in charge of LABS, EAS, Implant, TEST, REC, and Automation TOOLS within FAB 8.1.

22. By way of background, FAB 8.1 is a semiconductor manufacturing facility. Semiconductor manufacturing consists of three basic processes: (1) wafer manufacture, (2) wafer fabrication, and (3) packaging and testing. The wafer is a thin slice of semiconductor material which serves as the substrate for microelectronic devices. Silicon is the standard material but gallim arsenide, indium phosphide, and other group III-V or "compound semiconductors" can be used.

23. In wafer manufacturing, ingots of usbstrate are formed. The ingots are then sliced into wafers, washed and rounded by wet grinders. The wafers are then etched with nitric, hydrofluoric, or acetic acid to remove surface damage and to reduce thickness. Because a high level of contaminant and environmental control is needed, most fabrication is done in clean rooms.

24. On August 2, 2012, while in the Chemical Metal Plating Ballroom within the Clearnroom, I smelled bitter sweet fumes and particles due to an equipment malfunction. This exposure lasted approximately 3:00 minutes. Approximately three days later, I began having joint pain, swelling, blurred vision, dizziness, and an upset



stomach. My symptoms included multiple joint swelling, stiffness and pain, bleeding from my joints, intense nose bleeds, inability to walk, the need for the use of a cane, confusion, blood shot eyes, pealing of skin around my face, turning pale…etc. These symptoms progressed over the next five months.

25.   Based on the MSDS sheets, it is my understanding that on August 2, 2012 I was exposed to colloidal silica, crystalline silica, triazole compound, and a solvent "Slurry2" that contains organic acids and amines as well as the solvent exhaust system of the factory. The solvent exhaust system of the factory contained all solvents which are tied to the system. At the time of the incident there was approximately 1,369 chemicals in use plus trade secrets.

26.   In Implant, it is my understanding that I was exposed to arsenic, ion radiation, and possibly beryllium. On June 14, 2012, there was an arsenic exposure which I was never notified of it or informed about. Importantly, this exposure required HASAMAT Level B clean-up.

27.   In addition, beginning in the spring of 2011 I was overly exposed to dust, vapors, fumes, and particles including but not limited to trichloroethylene (TCE), Tris (2-Hydroxyethyl) Methylammonium Hydroxide (THEMAH), anhydrous citric acid, N-methyldiethanolamine, lactic acid, colloidal silica, crystalline silica, ion radiation, solvents, organic solvents, and heavy metals as the exhaust systems in the Fab 8.1 were over capacitated and failing, the Filter Fan Units (FFU) needed replacement filters, the air handlers/scrubbers needed added media, the Rotary Condenser Thermal Oxidizers



(RCTO) were failing and needed continual maintenance, the factory was dirty, and the labs had dust over all of the exhaust pipes in the chase from the TOOLS. Additionally, the gas cabinets in the subfab had dirty filters which would allow for escaped toxins within the ambient air due to failed air flow. I highly believe this is why Globalfoundries reduced the TOOL install work load (contracted bids with union workers) at this time because they knew that the factory was failing.

28. In January 2013, while hospitalized and on the verge of death, I was diagnosed with granulomatosis, anemia, diffuse ground glass opacities, protein urea, high blood pressure, T-cell and B-cell antibodies, severe renal failure, elevated SED rate, elevated CRP and ANCA associated vasculitis. As a result, I received intense medical intervention from Ellis Hospital and the American Red Cross.

29. I subsequently filed a claim with Workers' Compensation. While my claim was denied, it is important to note that OSHA did not do a complete investigation into my claims.

30. I was informed by the Director of OSHA's Albany office that she ordered the investigation into my claims stopped. As such, the investigation was terminated before it was completed. Had the investigation been completed, it is my belief, a causal connection between my illness and my exposures would have been established.

31. In addition, at the time Workers' Compensation made its decision with regard to my claim it was not in possession of all of my medical records. Thus, the



dismissal of my Workers' Compensation claim should not be used as a basis for dismissing this case.

32. In January/February 2013, I began treating with Dr. Robert Wang who has informed me that it is his opinion, with a reasonable degree of medical and scientific certainty, that my ANCA associated vasculitis is causally related to my exposures to the toxic substances outlined above as well as the nano silica particles. Dr. Wang has expressed his opinions in sworn testimony as well as in any accompanying declaration in opposition to Defendants' motions.

DATED: January 27, 2016

_____
TIMOTHY RIZZO

Sworn to before me this
27th day of January

_____
NOTARY PUBLIC
STATE OF NEW YORK

GREGORY S. MILLS
Notary Public, State of New York
Qualified in Saratoga County
No. 02MI6001821
Commission Expires Jan. 26, 2018

THE MILLS LAW FIRM LLP
ATTORNEYS AND COUNSELORS AT LAW