**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**TIMOTHY J. RIZZO,**

                              **Plaintiff,**

     **vs.**                                         **6:15-cv-557**
                                                 **(MAD/ATB)**

**APPLIED MATERIALS, INC.; and**
**GLOBALFOUNDRIES, U.S., INC.,**

                              **Defendants.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **THE MILLS LAW FIRM** | **GREGORY S. MILLS, ESQ.** |
| 1520 Crescent Road, Suite 100 | |
| Clifton Park, New York 12065 | |
| Attorneys for Plaintiff | |
| | |
| **LEWIS, BRISBOIS LAW FIRM** | **BERJ K. PARSEGHIAN, ESQ.** |
| New York Office | **PHILIP J. O'ROURKE, ESQ.** |
| 77 Water Street, Suite 2100 | |
| New York, New York 10005 | |
| Attorneys for Defendant | |
| Applied Materials, Inc. | |
| | |
| **JONES, DAY LAW FIRM** | **ERIC P. STEPHENS, ESQ.** |
| New York Office | **SHARYL A. REISMAN, ESQ.** |
| 222 East 41st Street | **TRACI L. LOVITT, ESQ.** |
| New York, New York 10017 | |
| Attorneys for Defendant | |
| GlobalFoundries, U.S., Inc. | |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Plaintiff Timothy J. Rizzo commenced this action on April 30, 2015, and filed an amended

complaint on July 29, 2015 asserting eleven causes of action and seeking at least $75,000 in

compensatory and punitive damages against Defendants Applied Materials, Inc. and GlobalFoundries, U.S., Inc. ("Defendants").[1]  *See* Dkt. No. 35.  In a Memorandum-Decision and Order dated March 22, 2016, the Court dismissed Counts III, IV, V, and VII of Plaintiff's amended complaint.  *See* Dkt. No. 106 at 8.  Currently before the Court are four motions: (1) Plaintiff's objections to a Text Order issued by Magistrate Judge Baxter, *see* Dkt. No. 157; (2) Plaintiff's motion for leave to file a second amended complaint, *see* Dkt. No. 158; (3) Defendants' motion to exclude the causation testimony of one of Plaintiff's expert witnesses, Dr. Robert S. Wang, *see* Dkt. No. 161; and (4) Defendants' motion for summary judgment, *see* Dkt. No. 162.

## II. BACKGROUND

**A.     Factual Background**

According to the amended complaint, in April of 2012, Plaintiff began working for AM Technical Solutions, Inc. ("AMTS") as a construction manager for Tool Install.  *See* Dkt. No. 35 ¶ 47.  On or about May 2, 2012, Plaintiff was assigned to GlobalFoundries's Fab 8 facility in Malta, New York to work in construction management overseeing the construction of factories for that facility.  *Id.* ¶¶ 48-49.  On August 2, 2012, while Plaintiff was working in the chemical metal plating room at the Fab 8 facility, a manufacturing tool labeled as POL2700 allegedly malfunctioned and exposed him to various substances, including colloidal silica, silicon and solvent solutions, and Trisilane and/or Trisilane compounds.  *Id.* ¶ 50.  In Plaintiff's proposed second amended complaint, Plaintiff alleges that he was exposed to silica and nanosilica during this incident.  *See* Dkt. No. 158-3 ¶ 37.  Plaintiff claims that he was also exposed on a chronic basis to "toxic and hazardous substances" from May of 2012 until August of 2012.  *See* Dkt. No.

---

[1] Plaintiff also initially sued AM Technical Solutions, Inc., which has been dismissed from this action.  *See* Dkt. No. 52.

35 ¶ 53. In Plaintiff's proposed second amended complaint, he alleges that his exposure period actually began in the spring of 2011, and he further alleges that he was exposed to various other substances, including dust, fumes, vapors, particles, and nano particles at the Fab 8 facility. *See* Dkt. No. 158-3 ¶ 40. Plaintiff further contends that he was exposed to numerous other toxic substances while working at the Fab 8 facility. *See* Dkt. No. 35 ¶ 54.

According to the amended complaint, at some point soon after the August 2, 2012 incident, Plaintiff developed an autoimmune disease diagnosed as granulomatosis with polyangiitis ("GPA") (formerly known as Wegener's Disease or Wegener's Granulomatosis). *See id.* ¶ 67; Dkt. No. 162-1 ¶ 1. GPA is an antineutrophil cytoplasmic autoantibodies ("ANCA")-associated vasculitis, or AAV. *See* Dkt. No. 162-15 ¶ 16. More specifically, GPA is an ANCA small vessel vasculitis ("ANCA-SVV"). *See id.* Vasculitis is a group of diseases that involves inflammation of blood vessels. *See id.* AAV is a category of vasculitis diseases that includes GPA, microscopic polyangiitis ("MPA"), renal-limited vasculitis and eosinophilic granulomatosis (also referred to as Churg-Strauss syndrome, or CSS). *See id.*; Dkt. No. 162-18 ¶ 12.

**B.   Procedural Background and Current Motions**

The parties participated in an initial telephone conference regarding discovery with Judge Baxter on August 13, 2015. *See* Text Minute Entry dated Aug. 13, 2015. During that conference, Judge Baxter ruled that discovery would be phased, with phase I addressing general causation of Plaintiff's alleged injury and its associated symptoms. *See id.* Judge Baxter approved a phase I scheduling order on September 1, 2015. *See* Dkt. No. 56. As courts have explained, "[g]eneral causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 402 (S.D.N.Y. 2005)

3

(quotation omitted). As such, the crux of this stage of the proceedings is whether any of the substances Plaintiff was allegedly exposed to are capable of causing GPA.

Following the conclusion of expert depositions, Defendants filed a letter requesting that the Court set a reasonable fee for the depositions of one of Plaintiff's experts, Dr. Robert S. Wang. *See* Dkt. No. 155 at 1. Defendants argued that Dr. Wang submitted an invoice based on an excessive hourly rate and excessive preparation time. *See id.* Judge Baxter granted Defendants' motion in part, reducing Dr. Wang's hourly rate and limiting Dr. Wang's preparation time for which he could charge Defendants. *See* Dkt. No. 156. Plaintiff then filed objections to Judge Baxter's order, arguing that Plaintiff should have had a chance to respond to Defendants' letter motion before Judge Baxter issued his order. *See* Dkt. No. 157-1 at 3. Plaintiff further argues that Judge Baxter should not have reached a conclusion with respect to Dr. Wang's expertise, and that Judge Baxter provided no legal basis for reducing Dr. Wang's hourly rate. *See id.* at 3-4. Defendants contend that Judge Baxter's ruling was not clearly erroneous, and, thus, should be affirmed. *See* Dkt. No. 164 at 8.

On December 20, 2016, the day before the deadline for filing summary judgment motions, Plaintiff filed a motion for leave to file a second amended complaint. *See* Dkt. No. 158. Plaintiff's proposed second amended complaint expands the time of his alleged exposure and adds additional exposures. *See* Dkt. No. 158-4 at 1. Defendants contend that Plaintiff should not be entitled to amend his complaint again, as any amendment would be unduly prejudicial to Defendants, and would be futile in any event. *See* Dkt. No. 165 at 9.

On December 21, 2016, Defendants filed a motion to exclude the causation testimony of Dr. Wang, *see* Dkt. No. 161, and a motion for summary judgment, *see* Dkt. No. 162. Dr. Wang opined that Plaintiff developed GPA as a result of his exposure to substances at GlobalFoundries.

4

*See* Dkt. No. 169-10 ¶¶ 73-75.  Defendants contend that Dr. Wang is not qualified to give an expert opinion on the causation of GPA.  *See* Dkt. No. 161-1 at 8-12.  Defendants argue that Dr. Wang "has never done any clinical research, published any papers, or conducted any epidemiological studies on GPA (or any other disorder)," has only seen two patients with GPA, and only treated those patients with respect to their pulmonary symptoms.  *See id.* at 11.  Defendants note that Dr. Wang "admits that he is not an expert in rheumatology, GPA, epidemiology, toxicology, or occupational medicine."  *Id.*  Moreover, Defendants argue that Dr. Wang's testimony is unreliable because the studies he purportedly relied on do not support his conclusions.  *See* Dkt. No. 162-2 at 24.

In their motion for summary judgment, Defendants argue that Plaintiff has failed to raise a genuine issue of fact with respect to general causation, which Plaintiff needs to prove in order to sustain any of his remaining causes of action.  *See id.* at 14.  Defendants claim that "[i]t is the unanimous view of respected medical institutions, authoritative treatises, and the scientific literature more broadly that GPA has no recognized cause."  *Id.* at 15.  Defendants present two expert witnesses on general causation, both of whom agree that GPA has no known cause.  *See id.* at 12.  Defendants reiterate their arguments that Dr. Wang's causation testimony should be excluded, and further argue that the opinions of Dr. Eli Miloslavsky, Plaintiff's other expert, should also be excluded.  *See id.* at 19-28.

Plaintiff claims that Dr. Wang is qualified to render a causation opinion and that his opinions are reliable.  *See* Dkt. No. 169-13 at 20-27.  Since Dr. Wang opined that Plaintiff's disease was caused by his exposures at GlobalFoundries, Plaintiff argues that he has raised sufficient questions of fact with respect to general causation to survive Defendants' motion for

summary judgment.  *See id.* at 26-28.  Moreover, Plaintiff claims that his exposures were not

limited to silica, and that his injuries are not limited to GPA.  *See id.* at 16-19.

**C.**      **The Experts and Their Opinions**

**          *1. Dr. David H. Garabrant***

Dr. Garabrant is one of Defendants' experts.  He is an epidemiologist and a licensed

physician who specializes in occupational medicine.  *See* Dkt. No. 162-15 ¶ 1.  He is Emeritus

Professor of Occupational Medicine and Epidemiology at the University of Michigan School of

Public Health.  *See id.*  He has published over 350 articles, book chapters, and abstracts related to

the long-term effects of chemicals on humans.  *See id.* ¶ 3.  He has reviewed scientific papers for

numerous journals, including journals on epidemiology and cancer research.  *See id.* ¶ 4.  He has

"devoted [his] career to the study of long-term health effects of chemicals on humans."  *Id.* ¶ 6.

To that end, he has "published peer-reviewed studies in the areas of autoimmune diseases related

to silicon compounds and solvents."  *Id.*

Dr. Garabrant opined that GPA has no known cause.  *See id.* ¶ 9.  He explained that, while

"[m]any environmental and occupational exposures have been postulated to cause GPA . . . none

ha[ve] been demonstrated to cause (let alone been generally accepted as a cause of) GPA."  *Id.* ¶

10.  Dr. Garabrant also acknowledged that some studies have reported associations between silica

and GPA, but explained that there is no consistent evidence of an association.  *See id.* ¶ 11.  Dr.

Garabrant further stated that "[n]o studies, reviews, text, or authoritative agencies or

organizations have reported a causal association between GPA and any environmental or

occupational exposure."  *Id.* ¶ 12.  Specifically with respect to the semiconductor or electronics

industry, as relevant here, Dr. Garabrant explained that no studies have reported even an

association between exposures in that industry and the development of GPA, let alone a causal association.  *See id.* ¶ 13.

### 2. Dr. Gary S. Hoffman

Dr. Hoffman is Defendants' other expert on general causation.  After working for thirteen years in general rheumatology at various institutions, Dr. Hoffman joined and eventually became the head of Dr. Anthony Fauci's Vasculitis and Related Diseases Section at the National Institutes of Health.  *See* Dkt. No. 162-18 ¶ 1.  Dr. Hoffman later founded the Cleveland Clinic Center for Vasculitis Care and Research.  *See id.* ¶ 2.  He has "authored over 340 articles and chapters and ha[s] edited four books, including various articles and chapters addressing the epidemiology, diagnosis and treatment of [GPA]."  *Id.* ¶ 3.

Like Dr. Garabrant, Dr. Hoffman opined that GPA has no known cause.  *See id.* ¶ 5.  He explained that "[n]o industrial chemicals or other agents at any exposure level or under any exposure conditions have been demonstrated, or are generally accepted by the medical and scientific community, to cause GPA."  *Id.* ¶ 6.  Dr. Hoffman also explained that the four different diseases within the broader category of AAV "are clinically and histopathologically distinct entities; they differ with respect to epidemiology (including etiology), diagnosis, prognosis and treatment."  *Id.* ¶ 12.

### 3. Dr. Robert S. Wang

Dr. Wang was Plaintiff's treating pulmonologist from January to December 2013.  *See* Dkt. No. 162-1 ¶ 47; Dkt. No. 169-14 ¶ 47.  He is board certified in pulmonary, critical care, and sleep medicine.  *See* Dkt. No. 169-10 ¶ 1.  During Plaintiff's workers' compensation proceedings in March of 2015, Dr. Wang testified that he would defer to a rheumatologist with respect to whether workplace exposures could be connected to Plaintiff's development of GPA.  *See* Dkt.

No. 162-10 at 16-17. When Dr. Wang submitted an opinion letter on January 22, 2016, he had not yet performed a comprehensive literature search on occupational exposures and whether they can cause GPA. *See id.* at 6-7; Dkt. No. 162-1 ¶ 56; Dkt. No. 169-14 ¶ 56. Moreover, Dr. Wang has only treated two patients with GPA, including Plaintiff, and his treatment focused on the pulmonary symptoms of GPA. *See* Dkt. No. 162-1 ¶ 52; Dkt. No. 169-14 ¶ 52. Dr. Wang admitted that he does not consider himself an expert in GPA, rheumatology, industrial hygiene, occupational medicine, toxicology, epidemiology, or otolaryngology. *See* Dkt. No. 162-10 at 11-12. However, Dr. Wang reviewed relevant literature in the weeks prior to his deposition, and offered a causation opinion. *See* Dkt. No. 162-1 ¶ 59; Dkt. No. 169-14 ¶ 59.

Dr. Wang opined that "[t]here is enough evidence to say that a causal relationship exists between [Plaintiff's] disease and his exposures to nanosilica and [trichloroethylene]." Dkt. No. 169-10 ¶ 73. Dr. Wang claimed that the studies relied on by Dr. Garabrant and Dr. Hoffman are inapplicable to Plaintiff's case, as those studies involved different types of work environments and exposures. *See id.* ¶ 36. Dr. Wang conceded that "no specific research with nanosilica and GPA exist," but still opined that Plaintiff's exposures to nanosilica caused his GPA. *Id.* ¶¶ 38, 73. Dr. Wang further claimed that "the causal relationship between silica and AAV is sufficient to establish causation in this matter as GPA is a form of AAV." *Id.* ¶ 43.

### 4. Dr. Eli Miloslavsky

Dr. Miloslavsky is Plaintiff's rheumatologist. *See* Dkt. No. 162-1 ¶ 11; Dkt. No. 169-14 ¶ 11. Dr. Miloslavsky did not submit a declaration or affidavit in response to Defendants' motion for summary judgment. However, during his deposition, Dr. Miloslavsky testified that he believes that there is a causal association between exposure to silica and GPA. *See* Dkt. No. 162-4 at 24-25. Dr. Miloslavsky admitted during his deposition that he did not attempt to

comprehensively review all of the literature on silica and the development of GPA.  *See id.* at 23.

Dr. Miloslavsky only relied on the studies that he believes support an association between

crystalline silica and GPA, but he admitted that there are other studies that have not found such an

association.[2]  *See id.* at 22-24.  When asked if he was aware of any authoritative text or

professional organization that has published the opinion that there is a causal relationship between

exposure to silica and GPA, his response was "I wouldn't know."  *Id.* at 26.

### 5. *Plaintiff's Other Physicians*

Plaintiff also originally submitted letters from two other physicians, Dr. Michael

Hodgman and Dr. Page V. Salenger.  *See* Dkt. No. 162-2 at 10.  Dr. Hodgman testified at his

deposition that Dr. Hoffman, one of Defendants' experts, is a "[b]rilliant man," and that Dr.

Hodgman would defer to Dr. Hoffman's opinions on the causes of GPA.  *See* Dkt. No. 162-8 at 9-

10.  Dr. Hodgman did not opine that a causal association exists between silica and GPA.  *See id.*

at 11, 15, 24-25.  Dr. Salenger testified that she has not reached any conclusions with respect to

whether exposure to any organic solvents or silica can cause GPA.  *See* Dkt. No. 162-9 at 9.

## III. DISCUSSION

---

[2] In Plaintiff's responsive statement of material facts, Plaintiff denies the assertion that "Dr. Miloslavsky reviewed and relied upon only those studies that he believed supported his position that exposure to crystalline silica causes GPA."  Dkt. No. 162-1 ¶ 12; Dkt. No. 169-14 ¶ 12.  Plaintiff's denial contains no citation to the record.  Local Rule 7.1 provides that each denial in a responsive statement of material facts must contain specific citations to the record, and that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  Local Rules N.D.N.Y. 7.1(a)(3).  Since Defendants' statement regarding the studies that Dr. Miloslavsky relied upon is supported by evidence in the record, the Court will deem Defendants' assertion as admitted. Moreover, Dr. Miloslavsky himself admitted that he only relied upon studies that support his conclusions.  *See* Dkt. No. 162-4 at 24-25.  As will be discussed below, Plaintiff continuously denies assertions in Defendants' statement of material facts without providing any specific citation to the record, and, often, Defendants' citation to the record is to an admission by Plaintiff's own experts.  The Court deems such statements as admitted.

**A.    Defendants' Motion to Exclude Expert Testimony**

*1. Rule 702 and* **Daubert**

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  That Rule provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "The party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence."  *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016).  As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Advisory Committee's Note.  Moreover, "the Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).

In reviewing the admissibility of expert testimony, courts must determine whether the expert is qualified to testify.  "Qualification 'may be based on a broad range of knowledge, skills, and training.'"  *Mirena*, 169 F. Supp. 3d at 412 (quoting *In re Fosamax Prods. Liab. Litig.*, 645 F.

Supp. 2d 164, 172 (S.D.N.Y.2009)). "Courts within the Second Circuit have liberally construed expert qualification requirements." *Id.* (quotation omitted). However, "[a]lthough the qualification requirement is liberally construed, it is not a nullity." *Mancuso v. Consol. Edison Co. of N.Y.*, 967 F. Supp. 1437, 1442 (S.D.N.Y. 1997).

A district court must also determine whether the expert testimony is reliable. As the Second Circuit has explained,

> [T]he district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Amorgianos*, 303 F.3d at 265 (alterations, quotations, and citations omitted). In *Daubert*, the Supreme Court provided a non-exhaustive list of factors for a district court to consider when determining the reliability of expert testimony, including: "1) whether the theory had been tested, 2) whether it had been subjected to peer review, 3) what the potential or known rate of error is, 4) what sort of standards control the technique's operation, [and] 5) whether the theory or technique has been generally accepted." *Mancuso*, 967 F. Supp. at 1441 (citing *Daubert*, 509 U.S. at 593-94) (other citations omitted). Courts have also considered other factors, such as whether an expert's testimony is based on research conducted independent of the litigation, and whether an expert "has unjustifiably extrapolated from an accepted premise to an unfounded conclusion." Fed. R. Evid. 702, Advisory Committee's Note. "In all cases, 'the test of reliability is flexible,' and a district court has 'the same broad latitude when it decides *how* to determine reliability as it

enjoys in respect to its ultimate reliability determination.'" *Mirena*, 169 F. Supp. 3d at 413

(quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999)).

"In deciding whether a step in an expert's analysis is unreliable, the district court should

undertake a rigorous examination of the facts on which the expert relies, the method by which the

expert draws an opinion from those facts, and how the expert applies the facts and methods to the

case at hand." *Amorgianos*, 303 F.3d at 267. "A minor flaw in an expert's reasoning or a slight

modification of an otherwise reliable method will not render an expert's opinion *per se*

inadmissible." *Id.* "The judge should only exclude the evidence if the flaw is large enough that

the expert lacks 'good grounds' for his or her conclusions." *Id.* (quotation and citation omitted).

Disputes regarding the nature and strength of an expert's credentials, an expert's use or application

of her methodology, or the existence or number of supporting authorities for an expert's opinion,

go to the weight, not the admissibility of her testimony. *McCullock v. H.B. Fuller Co.*, 61 F.3d

1038, 1044 (2d Cir. 1995). The Second Circuit has held that an expert need not "back his or her

opinion with published studies that unequivocally support his or her conclusions." *Amorgianos*,

303 F.3d at 266. "Where an expert otherwise reliably utilizes scientific methods to reach a

conclusion, lack of textual support may 'go to the weight, not the admissibility' of the expert's

testimony." *Id.* (quoting *McCollock*, 61 F.3d at 1044).

On the other hand, "when an expert opinion is based on data, methodology, or studies that

are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the

exclusion of that unreliable opinion testimony." *Id.*; *accord Ruggiero v. Warner-Lambert Co.*,

424 F.3d 249, 253 (2d Cir. 2005).[3] Furthermore, "it is critical that an expert's analysis be reliable

_____

[3] *See also Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358-60 (2d Cir. 2004) (holding
that expert testimony that was speculative and unreliable was properly not considered by the

(continued...)

at every step." *Amorgianos*, 303 F.3d at 267.  Of course, "the district court must focus on the

principles and methodology employed by the expert, without regard to the conclusions the expert

has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266

(citing *Daubert*, 509 U.S. at 595).  Nevertheless, "conclusions and methodology are not entirely

distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Accordingly, "[a]

court may conclude that there is simply too great an analytical gap between the data and the

opinion proffered." *Id.* at 146 (citations omitted).

Moreover, "[a]fter determining that a witness is qualified to testify as an expert as to a

particular matter and that the opinion is reliable, Rule 702 requires the district court to determine

whether the expert's testimony will 'help the trier of fact.'" *Mirena*, 169 F. Supp. 3d at 413

(quoting Fed. R. Evid. 702).

As a final note, the primary issue at this stage of the litigation is general causation.  As

mentioned above, "a plaintiff in a toxic tort case must prove both general causation, that is, that

the alleged toxin is capable of causing injuries of the kind suffered by the plaintiff, and specific

causation, that is, that the alleged toxin caused the particular plaintiff's injuries." *In re Rezulin*

*Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 422 (S.D.N.Y. 2005).  "To establish general causation a

plaintiff must show that the toxin alleged to be the cause of the plaintiff's malady is capable of

---

[3](...continued)
district court on summary judgment); *Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d
413, 416-17 (W.D.N.Y. 2005) (noting that "[a]n otherwise well-credentialed expert's opinion may
be subject to disqualification if he fails to employ investigative techniques or cannot explain the
technical basis for his opinion"); *Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d 875, 887-89
(E.D.N.Y. 2004) (declining to consider plaintiff's expert's testimony in deciding pending motions
for summary judgment based on a finding that the expert's testimony "is unreliable under Fed. R.
Evid. 702 and the principles articulated in *Daubert* and its progeny," given that the expert (1)
qualified his opinions, (2) failed to support his opinions with any methodology which the court
could analyze, and (3) rested his opinions "upon nothing more than subjective belief and
unsupported speculation").

causing the type of injury alleged when a person is exposed to it in a concentration similar to that to which the plaintiff claims to have been exposed." *Green v. McAllister Bros.*, Nos. 02 Civ. 7588, 03 Civ. 1482, 2005 WL 742624, *11 (S.D.N.Y. Mar. 25, 2005) (citing *Mancuso*, 967 F. Supp. at 1445). "The *Daubert* requirements apply alike to expert opinions on general and specific causation." *In re Rezulin*, 369 F. Supp. 2d at 422.

### 2. Dr. Wang

#### a. Qualifications

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citation omitted). "In assessing whether a proposed expert is 'qualified,' the trial judge should remember the 'liberal[ ] purpose' of Fed. R. Evid. 702, and remain 'flexibl[e]' in evaluating the proposed expert's qualifications." *Krause v. CSX Transp.*, 984 F. Supp. 2d 62, 74 (N.D.N.Y. 2013) (citing *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985)). "Accordingly, assuming that the proffered expert has the requisite minimal education and experience in a relevant field, courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit." *Canino v. HRP, Inc.*, 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000) (internal citation omitted). "The expert may not, however, offer an opinion on a different field or discipline." *Id.* (citation omitted).

Defendants argue that Dr. Wang is not qualified to give a causation opinion in this case. Defendants largely rely on *Mancuso v. Consol. Edison Co. of N.Y.*, 967 F. Supp. 1437 (S.D.N.Y. 1997) and *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358 (D.N.J. 1995). In *Mancuso*, the court held that a doctor was not qualified to give a causation opinion regarding whether PCBs caused

the plaintiffs' injuries. *See Mancuso*, 967 F. Supp. at 1442-44. The court noted that the doctor had never testified in a toxic tort case before, that he had no training in environmental medicine or PCBs, that he had written no articles on toxicology or environmental diseases, and that the doctor primarily relied upon books provided by the plaintiffs' lawyer. *See id.* at 1442. Moreover, despite the doctor's contention that he had read numerous articles prior to giving his testimony, he "was unable to answer critical questions regarding PCBs." *Id.* at 1444. Likewise, in *Diaz*, the court held that the plaintiff's doctor was not qualified to give an opinion regarding whether the plaintiff's exposure to platinum salts caused his chronic asthma. *See Diaz*, 893 F. Supp. at 372-73. The court noted that the doctor "has no other qualifications other than his medical education and his years practicing as a pulmonologist; he is neither an epidemiologist nor a toxicologist; he does not specialize in occupational medicine; and he had never treated a patient, before [plaintiff], suffering from the platinum allergy." *Id.* Further, the doctor "only casually studied the literature on the platinum allergy" and "certainly [did] not stud[y] any papers that contradict his opinion . . . ." *Id.* at 372.

Here, as discussed above, Dr. Wang was Plaintiff's treating pulmonologist from January to December 2013. *See* Dkt. No. 162-1 ¶ 47; Dkt. No. 169-14 ¶ 47. Dr. Wang concedes that he is not an expert in GPA, epidemiology, occupational medicine, toxicology, or rheumatology. *See* Dkt. No. 162-1 ¶ 49; Dkt. No. 169-14 ¶ 49. Dr. Wang had not yet formed a causation opinion during Plaintiff's workers' compensation proceedings in March of 2015 or in his January 2016 opinion letter regarding Plaintiff's GPA. *See* Dkt. No. 162-1 ¶¶ 55-56; Dkt. No. 169-14 ¶¶ 55-56. Dr. Wang admits that he formed his opinion by reviewing literature in the weeks before his deposition. *See* Dkt. No. 162-1 ¶ 59; Dkt. No. 169-14 ¶ 59. Further, prior to this case, Dr. Wang

had never given the opinion that someone's GPA was caused by a workplace exposure.[4]  *See* Dkt. No. 161-1 ¶ 54; Dkt. No. 162-10 at 24.  Moreover, Dr. Wang has only treated two patients with GPA, including Plaintiff, and his treatment focused on only the pulmonary symptoms of GPA. *See* Dkt. No. 162-1 ¶ 52; Dkt. No. 169-14 ¶ 52.

As such, Plaintiff's only argument that Dr. Wang is qualified is based on the literature review that Dr. Wang performed just weeks before giving his opinion.  The Court notes that "[i]t is hardly the hallmark of expertise to conduct a survey of medical literature just before testifying and to rely on articles up to then unknown or unread by the expert."  *Diaz*, 893 F. Supp. at 373 n.7.  Dr. Wang is not an epidemiologist or a toxicologist, and is certainly not an expert on GPA. Moreover, Dr. Wang has not published any paper or acted as a peer reviewer for any peer reviewed publication.  *See* Dkt. No. 161-3 at 8.  However, the Court is also aware of the liberal purpose of Rule 702.  This case is at least somewhat distinguishable from *Mancuso* and *Diaz*, where the purported experts lacked critical knowledge of the subject at issue or only casually reviewed the literature.  *See Mancuso*, 967 F. Supp. at 1444; *Diaz*, 893 F. Supp. at 372.  Here, Dr. Wang insists that he has extensively reviewed the literature, and he was able to discuss the relevant studies during his deposition.  Accordingly, whether Dr. Wang is qualified to give an opinion seems questionable.  The Court is concerned with Dr. Wang's utter lack of experience and training with GPA and that Dr. Wang's opinion is solely based on a recent review of literature, but the Court is also mindful that it must remain flexible in determining whether an expert is

---

[4] In Plaintiff's response to Defendants' statement of material facts, Plaintiff purports to deny this assertion, citing to Dr. Wang's deposition testimony.  *See* Dkt. No. 169-14 ¶ 54.  During Dr. Wang's deposition, Dr. Wang was asked whether this is the first case that he has told someone that their GPA was caused by an occupational exposure.  *See* Dkt. No. 162-10 at 24.  It appears that Dr. Wang did not understand the question at first as he gave an answer that was not responsive to that question.  However, the question was then immediately read back to Dr. Wang, and he admitted that this is the first case in which he has given such an opinion.  *See id.*

qualified. That being said, the Court need not linger on the issue of Dr. Wang's qualifications, because it is abundantly clear to the Court that Dr. Wang's opinion is not reliable, and, therefore, inadmissible.

### b. Reliability

Dr. Wang opined that Plaintiff's exposures to nanosilica and trichloroethylene ("TCE")[5] are capable of causing (and did cause) his GPA. *See* Dkt. No. 169-10 ¶¶ 42, 45.

During Dr. Wang's deposition, he testified that his opinion that Plaintiff's GPA was caused by Plaintiff's exposure to nanosilica is based on one article, entitled Napierska, D., 2010. The nanosilica hazard: another variable entity. Part. Fibre. Toxicol. 7, 39-37 ("Napierska 2010"). *See* Dkt. No. 162-10 at 58-59; Dkt. No. 162-1 ¶ 63. Napierska 2010 reviewed nanosilica, including crystalline and amorphous/colloid forms of silica. *See* Dkt. No. 169-10 ¶ 53. Dr. Wang explained that "[t]he importance of this review is that it looks at multiple in vivo and in vitro studies and provides insight into the mechanism of the inflammatory effects of nanosilica via oxidation from the formation of reactive oxygen species. Cytotoxic and inflammatory effects were seen and cellular changes were observed within 24 hours." *Id.* However, Napierska 2010 did not even mention GPA or AAV. *See* Dkt. No. 162-1 ¶ 64; Dkt. No. 169-14 ¶ 64; Dkt. No. 162-15 ¶ 63. Plaintiff concedes that Napierska 2010 makes no conclusion with respect to the exposure to silica and the development of GPA. *See* Dkt. No. 162-1 ¶ 65; Dkt. No. 169-14 ¶ 65. As Dr. Garabrant explained, "[t]he entirety of the article relates to cell and animal testing as a basis for certain proposed and theoretical mechanisms for toxicity," and does not provide "data or conclusions with respect to any specific disease." Dkt. No. 162-15 ¶ 63. Although noting that

---

[5] Trichloroethylene is one of the solvents that Plaintiff alleges he was exposed to at GlobalFoundries's Fab 8 facility. *See* Dkt. No. 158-3 ¶ 41; Dkt. No. 169-10 ¶ 44.

Napierska 2010 reviews multiple studies, Plaintiff concedes that Napierska 2010 is not an epidemiological study and that no epidemiological studies have been done on exposure to nanosilica. *See* Dkt. No. 162-1 ¶¶ 66-67; Dkt. No. 169-14 ¶¶ 66-67. Accordingly, Napierska 2010 does not support Dr. Wang's opinion that silica can cause GPA.

This appears to be the extent of the evidence that Dr. Wang relies on to support his causation opinion with respect to nanosilica. However, Dr. Wang makes other assertions in his declaration with respect to nanosilica and GPA. Dr. Wang notes that Dr. Garabrant acknowledges that some studies have found significant associations between crystalline silica and GPA. *See* Dkt. No. 169-10 ¶ 27. To put Dr. Garabrant's statement in context, he stated that "[t]here is no consistent evidence of an association (let alone a causal association) between crystalline (or any form of) silica exposure and the development of GPA. Although some studies have reported significant associations, others have not demonstrated such associations." Dkt. No. 162-15 ¶ 29. Dr. Garabrant further explained that "[t]he studies that report statistically significant positive associations with crystalline silica exposure generally involve 10 or more years of exposure, with GPA being diagnosed 10 or more years after the beginning of exposure (also known as latency)." *Id.* ¶ 30. Dr. Garabrant also noted that "[n]o studies, or meta-analyses or reviews of this body of scientific literature report the observed association as causal."[6] *Id.* Dr. Garabrant cited and explained numerous studies to support these conclusions. *See id.* ¶¶ 28-50. Dr. Wang does not appear to refute these assertions by Dr. Garabrant, and Dr. Wang's claim that

---

[6] As Dr. Garabrant explained, observed associations between a substance and a disease do not automatically establish a cause and effect relationship. *See* Dkt. No. 162-15 ¶ 24. Scientists typically determine whether an observed association amounts to a causal relationship by considering the Bradford Hill guidelines, which both Plaintiff's and Defendants' experts outlined. *See id.* ¶¶ 23, 25; Dkt. No. 169-10 ¶ 47.

Dr. Garabrant acknowledges a significant association in some studies does nothing to support Dr. Wang's causation opinion.

With respect to TCE, Dr. Wang relies on two articles to support his causation opinion. The first article is Cooper, G.S., 2009. Evidence of Autoimmune-Related Effects of Trichloroethylene Exposure from Studies in Mice and Humans. Envrion. Health Perspectives 117(5), 696-702 ("Cooper 2009"). *See* Dkt. No. 162-10 at 75; Dkt. No. 162-1 ¶ 68. The second article is Miller, F.W., 2012. Epidemiology of environmental exposures and human autoimmune diseases: findings from a National Institute of Environmental Health Sciences Expert Panel Workshop. J. Autoimmun. 39, 259-271 ("Miller 2012"). *See* Dkt. No. 162-10 at 75; Dkt. No. 162-1 ¶ 68.

Cooper 2009 discussed in vitro data, that is, data collected from experiments conducted outside of a living organism. *See* Dkt. No. 162-1 ¶ 69; Dkt. No. 169-14 ¶ 69. During his deposition, Dr. Wang testified that the data suggests a possible mechanism for the development of an autoimmune disease. *See* Dkt. No. 162-10 at 73-74. In his declaration, Dr. Wang stated that "[t]here is a dose response with TCE's and the mechanism seen is that TCE's alters the conformation of proteins and result in an autoimmune response and affects T-cell function." Dkt. No. 169-10 ¶ 55. However, Dr. Wang acknowledged that Cooper 2009 does not point to the development of any specific autoimmune disease, including GPA or even AAVs generally. *See* Dkt. No. 162-10 at 73-74; Dkt. No. 162-1 ¶ 70; Dkt. No. 169-14 ¶ 70. Accordingly, Cooper 2009 does not support Dr. Wang's conclusion that TCE can cause GPA.

Miller 2012 found a causal association between silica and AAV generally. *See* Dkt. No. 162-10 at 69-70, 84. Dr. Garabrant noted that Miller 2012 presented no new data but simply reviewed other studies, and failed to include several studies with respect to silica and GPA and

with respect to silica and the broader group of ANCA-positive diseases. *See* Dkt. No. 162-15 ¶ 64. In any event, Miller 2012 did not make any specific findings with respect to GPA, and specifically noted that they did not have enough evidence to draw a causal association between silica and any subgroup of AAV, such as GPA. *See* Dkt. No. 162-10 at 69-70, 84; Dkt. No. 162-1 ¶ 73; Dkt. No. 169-14 ¶ 73. Moreover, with respect to solvents and AAVs, Miller 2012 did not note an association to be likely. *See* Dkt. No. 162-1 ¶ 75; Dkt. No. 169-14 ¶ 75.

Despite Miller 2012's failure to reach a conclusion with respect to silica and GPA, and with respect to solvents and AAVs, Dr. Wang still opines that Miller 2012 supports his opinion that Plaintiff's exposure to TCE more likely than not caused Plaintiff's GPA. *See* Dkt. No. 169-10 ¶ 45; Dkt. No. 162-10 at 75-76. During Dr. Wang's deposition, he emphasized the fact that Miller 2012 did reach a conclusion with respect to silica and AAV generally, *see* Dkt. No. 162-10 at 69-70, and in his declaration, Dr. Wang stated that "the causal relationship between silica and AAV is sufficient to establish causation in this matter as GPA is a form of AAV," Dkt. No. 169-10 ¶ 43. Dr. Wang cites nothing to support this assertion that causation with respect to AAV is sufficient to establish causation with respect to GPA, and Dr. Wang provides no further explanation on how he reached this opinion.[7]

As mentioned above, Dr. Hoffman explained that the four different forms of AAV "are clinically and histopathologically distinct entities; they differ with respect to epidemiology (including etiology), diagnosis, prognosis and treatment." Dkt. No. 162-18 ¶ 12. Dr. Hoffman

---

[7] The Court notes that Dr. Wang relies on Miller 2012 to support his causation opinion with respect to TCE, and seemingly not nanosilica, despite Miller 2012's finding of a causal association between silica and AAV and its conclusion that no association was likely between solvents and AAV. Regardless, because Miller 2012 found a causal association between silica and AAV, the Court will still analyze Dr. Wang's claim that causation with respect to AAV is sufficient to establish causation with respect to GPA.

explained that, while GPA and MPA (which is another form of AAV) share some common clinical features, they are clinically, serologically, pathologically, and genetically distinct. *See id.* ¶ 13. Dr. Hoffman cited various studies and examples to support this, including a study finding unique genetic markers for GPA compared to MPA; that severe nasal inflammation is typical in GPA but absent in MPA; and the presence of inflammatory mass lesions in GPA that is absent in MPA. *See id.* ¶ 14. Dr. Hoffman also provided an illustrative summary highlighting the numerous distinctions between GPA and MPA. *See id.* ¶ 15. Dr. Hoffman further explained that GPA can be studied independently and cited various studies that have considered GPA and other forms of AAV specifically, including one in which Dr. Hoffman was the senior author. *See id.* ¶¶ 17, 20, 24.

Dr. Garabrant also explained that each disease has its own distinct etiology and that studies of the individual diseases need to be conducted to draw causal conclusions with respect to those specific diseases. *See* Dkt. No. 162-15 ¶ 16. Likewise, Dr. Miloslavsky, Plaintiff's other expert, testified that each AAV, and each ANCA-SVV, have different manifestations, presentations, diagnosis, treatment, and causes. *See* Dkt. No. 162-4 at 11. Moreover, Plaintiff himself concedes in his responsive statement of material facts that AAV "is a category of diseases that includes a number of individual diseases with differing diagnoses, presentations, treatments and causes." *See* Dkt. No. 162-1 ¶ 18; Dkt. No. 169-14 ¶ 18.

Accordingly, Dr. Wang has offered no support for his opinion that a causal relationship with respect to AAV is sufficient to find a causal relationship with respect to GPA. On the other hand, Dr. Hoffman cited various studies and examples demonstrating that a causal relationship with respect to AAV is insufficient to make a finding with respect to GPA. *See* Dkt. No. 162-18 ¶¶ 12-17. Moreover, Dr. Wang is the only doctor to give this opinion—even Plaintiff's other

expert testified that each AAV has distinct treatment and causes. *See* Dkt. No. 162-4 at 11. Dr. Wang does not cite to any facts, data, studies, examples, or anything whatsoever to support his claim that a causal relationship with respect to AAV is sufficient to make a finding with respect to GPA. Nor does Dr. Wang give any kind of medical explanation or justification for his opinion. Moreover, Dr. Wang admitted during his deposition that AAVs are a heterogeneous group of diseases. *See* Dkt. No. 162-10 at 69-70. As such, the Court rejects Dr. Wang's testimony that causation with respect to AAV is sufficient to establish causation with respect to GPA.

In sum, there are no studies that support Dr. Wang's opinion that nanosilica or TCE are capable of causing GPA. Although Dr. Wang purportedly relies on Napierska 2010, Cooper 2009, and Miller 2012, these studies simply do not come close to supporting Dr. Wang's opinion. As the Supreme Court has held, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted). That is exactly the situation presented here.

Plaintiff argues that Dr. Wang and Defendants' experts generally rely on the same studies but just reach different conclusions. *See* Dkt. No. 169-13 at 28. Plaintiff contends that "Dr. Wang's contrary opinion with regard to these studies, particularly as they apply to the specific facts of this case, merely creates a question of fact. It does not render his opinion unreliable." *Id.* However, the studies simply lend no support for Dr. Wang's conclusions in this case.

Of course, as mentioned above, an expert does not need to rely on published studies that unequivocally support his or her conclusion. *See Amorgianos*, 303 F.3d at 266. In *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995), the Second Circuit "affirmed the district court's

admission of medical expert testimony despite the fact that the expert 'could not point to a single piece of medical literature' that specifically supported the expert's opinion." *Id.* at 266-67 (quoting *McCullock*, 61 F.3d at 1043). As long as an expert reliably uses scientific methods to reach his or her conclusions, the lack of published studies in support of that opinion may "go to the weight, not the admissibility" of the testimony. *See id.* at 267 (quoting *McCullock*, 61 F.3d at 1044) (other citation omitted).

It does appear that Dr. Wang gives (or attempts to give) other explanations to support his causation opinions beyond his reliance on the aforementioned studies. At the outset, the Court notes that Dr. Wang only recently developed his causation opinion based on a purported review of the literature, so it seems unlikely that Dr. Wang could offer a valid causation opinion based on his own theories, research, or data. Dr. Wang argues that the studies cited by Dr. Garabrant and Dr. Hoffman involve the farming, construction, and sand-blasting industries, while Plaintiff works in the semiconductor industry. *See* Dkt. No. 169-10 ¶ 37. Dr. Wang believes that comparing those industries to the semiconductor industry "is like comparing an auto-mechanic to a car designer, where the exposure is unrefined verses extremely refined." *Id.* Although Dr. Wang concedes that "no specific research with nanosilica and GPA exist[s]," he still believes that a causal relationship exists. *Id.* ¶¶ 37, 42. Dr. Wang provides no real explanation for his opinion, other than his claim that nanosilica is more refined than silica. He does not offer any kind of data or scientific explanation to support this.

With respect to TCE, Dr. Wang claims as follows:

> TCE alters proteins so they are seen by the immune system and can be viewed as foreign and along with the effect of nanosilica to cause cell death and to activate the immune system provides the mechanism behind [Plaintiff's] disease process being activated by his work exposures at GlobalFoundries. It's as if [Plaintiff] is the

> can of gasoline, the TCE opens that can, and the nanosilica is that match that ignites the flames of his GPA.

*Id.* ¶ 80. Again, Dr. Wang presents no scientific evidence or data to support this opinion whatsoever, and this is the first time that Dr. Wang has ever given such an opinion.

In sum, Dr. Wang points to no studies that support his causation opinion with respect to nanosilica or TCE. The studies that he purportedly relies on simply do not support his conclusions. To the extent that Dr. Wang purports to offer causation testimony that is not based on studies but based on his own observations, experiments, or analysis, this testimony is also unreliable. Considering the *Daubert* factors outlined above, Dr. Wang has never tested his theories about nanosilica or TCE. Not only are Dr. Wang's theories not generally accepted by the medical community, but it is abundantly clear based on all the evidence in the record that the medical community believes that GPA has no known cause. Moreover, this is the first and only time Dr. Wang has given such an opinion, and his opinion was developed solely for this litigation. As such, Dr. Wang's causation opinion is not reliable. *See In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 423 (S.D.N.Y. 2005) (precluding expert testimony when that testimony "appears to have no acceptance outside this litigation, let alone widespread acceptance.").

Accordingly, the Court finds that Dr. Wang's opinion is not reliable, and Defendants' motion to exclude such testimony is granted.

### 3. Dr. Miloslavsky

Dr. Miloslavsky testified at his deposition that he believes there is a causal association between silica and GPA. *See* Dkt. No. 162-4 at 24-25. Dr. Miloslavsky relies on six articles to support his opinion, including Gomez-Puerta, J.A., 2013. The association between silica exposure and development of ANCA-associated vasculitis: systematic review and meta-analysis. Autoimmun. Rev. 12, 1129-1135 ("Gomez-Puerta 2013"); Hogan, S.L., 2001. Silica exposure in

24

anti-neutrophil cytoplasmic autoantibody-associated glomerulonephritis and lupus nephritis. J. Am. Soc. Nephrol. 12, 134-142 ("Hogan 2001"); Hogan, S.L., 2007. Association of silica exposure with anti-neutrophil cytoplasmic autoantibody small-vessel vasculitis: a population-based, case-control study. Clin. J. Am. Soc. Nephrol. 2, 290-299 ("Hogan 2007"); Nuyts, G.D., 1995. Wegener granulomatosis is associated to exposure to silicon compounds: a case-control study. Nephrol. Dial. Transplant. 10, 1162-1165 ("Nuyts 1995"); Lane, S.E., 2003. Are environmental factors important in primary systemic vasculitis? A case-control study. Arthritis & Rheumatism 48, 814-823 ("Lane 2003"); and Webber, M.P., 2015. Nested case-control study of selected systemic autoimmune diseases in World Trade Center rescue/recovery workers. Arthritis Rheumatol. 67, 1369-1376 ("Webber 2015"). *See id.* at 22-23; Dkt. No. 162-1 ¶ 15; Dkt. No. 169-14 ¶ 15.

Defendants argue that Dr. Miloslavsky's testimony should be excluded for several reasons. Defendants contend that Dr. Miloslavsky did not perform a comprehensive review of all the available scientific evidence. *See* Dkt. No. 162-2 at 22. Without such a comprehensive review, Defendants contend that Dr. Miloslavsky's testimony is inherently unreliable. *See id.* Defendants further argue that Dr. Miloslavsky's opinion is unreliable because none of the cited studies support his conclusion. *See id.* at 24. Plaintiff did not respond to Defendants' arguments with respect to the admissibility of Dr. Miloslavsky's testimony. Moreover, Plaintiff did not attach a declaration or affidavit from Dr. Miloslavsky in response to Defendants' motion for summary judgment.

During Dr. Miloslavsky's deposition, he testified as follows:

> Q: You have noted on your notes that you produced to us today, which is Exhibit 30, six studies: Nuyts, which is a 1995 publication article; Hogan, a 2001 publication; Hogan, a 2007

publication; Lane, a 2003 publication; Webber, a 2015 publication; and Gomez-Puerta, which is a 2013 publication.

And I take it that these are the studies that—are these the studies you rely on for the opinions you've expressed in the letter?

A: Yes.

Q: So these are a select few studies that exist on the literature in this studying exposures to silica and GPA.

I take it that you did not attempt to undertake a comprehensive review and analysis of all the literature that exists on exposures to silica and GPA; is that correct?

A: That's correct.

Q: And that's because your role really was a treating physician to treat and provide therapy to [Plaintiff]; is that correct?

A: That's correct.

Q: So, in essence, have you cited on this Exhibit 30 just those studies that you believe support such an association between crystalline silica and GPA, but you recognize that there are a number of studies out there that also demonstrate a lack of association between exposure to crystalline silica and GPA?

A: Yes.

Dkt. No. 162-4 at 22-24.

As discussed above, courts consider various factors in determining whether expert testimony is reliable. One such factor, as outlined in the Advisory Committee's Note to Rule 702, is "[w]hether the expert has adequately accounted for obvious alternative explanations." Fed. R. Evid. 702, Advisory Committee's Note. As the Southern District of New York has explained:

This is appropriate because any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect. By the same token, if the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable. Accordingly, courts have excluded

> expert testimony where the expert selectively chose his support
> from the scientific landscape.

*In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (quotation and citations omitted); *see also In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 26 F. Supp. 3d 449, 460-61 (E.D. Pa. 2014) ("The Court finds that the expert report prepared by [plaintiffs' expert] does selectively discuss studies most supportive of her conclusions, as [plaintiffs' expert] admitted in her deposition, and fails to account adequately for contrary evidence, and that this methodology is not reliable or scientifically sound.").

Here, Dr. Miloslavsky admitted that he only reviewed articles that support an association between crystalline silica and GPA.[8] *See* Dkt. No. 162-4 at 23-24. As other courts have found, this is not a reliable methodology in forming a causation opinion. Moreover, Plaintiff does not even appear to argue that Dr. Miloslavsky's testimony is admissible.[9] *See generally* Dkt. No. 169-13.

The Court also finds that Dr. Miloslavsky's opinion is unreliable because, like Dr. Wang, the studies that Dr. Miloslavsky purportedly relies on simply do not support his opinion that exposure to silica is capable of causing GPA. The Court will briefly discuss the six studies that Dr. Miloslavsky relies on.

---

[8] Despite Dr. Miloslavsky's admission in his deposition that he only relied on studies that supported an association between crystalline silica and GPA, *see* Dkt. No. 162-4 at 23-24, Plaintiff denies this assertion in his responsive statement of material facts, *see* Dkt. No. 162-1 ¶ 12; Dkt. No. 169-14 ¶ 12. Moreover, Plaintiff's denial is simply a blanket denial with no citation to the record. Accordingly, the Court deems this statement as admitted.

[9] Plaintiff also admits both that "[a] comprehensive literature review is a prerequisite to any reliable causation opinion," and that Dr. Miloslavsky did not "attempt to undertake a comprehensive review and analysis of all the literature that exists on exposures to silica and GPA." Dkt. No. 162-1 ¶¶ 9, 11; Dkt. No. 169-14 ¶¶ 9, 11.

Gomez-Puerta 2013 is a meta-analysis on the potential association between silica exposure and the development of AAV. *See* Dkt. No. 162-1 ¶ 17; Dkt. No. 169-14 ¶ 17. This article did not reach a conclusion regarding exposure to silica and the development of GPA specifically.[10] *See* Dkt. No. 162-4 at 32; Dkt. No. 162-1 ¶ 19. The studies reviewed in Gomez-Puerta 2013 involved mean latency periods of more than ten years, and the average duration of exposure was 21 years. *See* Dkt. No. 162-1 ¶¶ 21, 22; Dkt. No. 169-14 ¶¶ 21, 22. Gomez-Puerta 2013 concluded that "[o]ur summary estimates lend support to the hypothesis that silica may act as an environmental 'trigger' for the development of AAV, as well as other autoimmune diseases, and bring us closer to an understanding of the pathogenesis of AAV. However, further studies are warranted . . . ." Dkt. No. 162-4 at 36-37. Dr. Miloslavsky testified that Gomez-Puerta 2013's conclusion accurately reflects his opinion about the science that exists on the subject. *See id.* Moreover, Dr. Wang contends that this article examined studies that do not mirror Plaintiff's work environment or type of exposure. *See* Dkt. No. 169-10 ¶ 61. Accordingly, this article does not support the conclusion that exposure to silica is capable of causing GPA.

Hogan 2001 examined potential associations between silica exposure and the development of AAV and reported subanalyses for GPA. *See* Dkt. No. 162-1 ¶ 24; Dkt. No. 169-14 ¶ 24. The odds ratio, which is a ratio that measures the strength of association between an exposure and an outcome, was not statistically significant for GPA in Hogan 2001. *See* Dkt. No. 162-1 ¶ 25; Dkt. No. 169-14 ¶ 25. Dr. Miloslavsky himself testified that "I would just say that this study does not necessarily prove or disprove the GPA association. It could not have done that." Dkt. No. 162-4

---

[10] Again, Plaintiff denies this assertion in his responsive statement of material facts. *See* Dkt. No. 162-1 ¶ 19; Dkt. No. 169-14 ¶ 19. Plaintiff cites to Dr. Miloslavsky's testimony, but Dr. Miloslavsky agreed that Gomez-Puerta 2013 did not reach a conclusion with respect to GPA. *See* Dkt. No. 162-4 at 32.

at 41.  Dr. Miloslavsky further conceded that one cannot conclude from this study that silica exposure causes GPA.  *See id.*  Moreover, Dr. Wang contends that Hogan 2001 reviewed cases that do not mirror Plaintiff's type of exposure.  *See* Dkt. No. 169-10 ¶ 57.

Hogan 2007 examined potential associations between chronic exposure to silica and the development of AAV.  *See* Dkt. No. 162-1 ¶ 29; Dkt. No. 169-14 ¶ 29.  None of the findings in Hogan 2007 are specific to GPA.  *See* Dkt. No. 162-1 ¶ 30; Dkt. No. 169-14 ¶ 30.  The minimum amount of exposure required for someone to be considered exposed for the purposes of this study was one year, and the median duration of exposure was thirteen years.  *See* Dkt. No. 162-1 ¶¶ 31, 33; Dkt. No. 169-14 ¶¶ 31, 33.  Dr. Garabrant explained that this study found a "borderline statistically significant association between ANCA-positive SVV and high lifetime silica exposure, but no association between lifetime medium or low silica exposure."  Dkt. No. 162-15 ¶ 48.  Dr. Wang also noted that this study found "a positive relationship with silica and AAV's, but only at high lifetime exposure."  Dkt. No. 169-14 ¶ 65.  Accordingly, Hogan 2007 did not reach any conclusions with respect to GPA, and the association found between silica and ANCA-SVV was only for exposure periods much longer than Plaintiff's.

Nuyts 1995 examined the potential association between silica exposure and the development of GPA specifically.  *See* Dkt. No. 162-1 ¶ 36; Dkt. No. 169-14 ¶ 36.  Dr. Garabrant explained that "[t]his study found a statistically significant association between GPA and long-term exposure to silica in dusty occupations."  Dkt. No. 162-15 ¶ 33; *see also* Dkt. No. 162-18 ¶ 40d.  All subjects in the study had a minimum of six years of exposure to silica and worked in occupations such as bricklaying, sandblasting, construction, and farming, which result in high exposure to crystalline silica dust.  *See* Dkt. No. 162-1 ¶ 37; Dkt. No. 169-14 ¶ 37.  Both Dr. Garabrant and Dr. Wang agree that the exposures in that study are not comparable to Plaintiff's

exposures, *see* Dkt. No. 162-15 ¶ 33; Dkt. No. 169-10 ¶ 56, and Dr. Miloslavsky does not appear

to contend otherwise, *see* Dkt. No. 162-4 at 49. Specifically, Dr. Wang stated that "[t]his study

has occupations . . . which unfortunately do not mirror [Plaintiff's] work environment and

exposure. The exposures to silica, in the above occupations, do not result in the exposure to

nanosilica." Dkt. No. 169-10 ¶ 56. As such, this study does not support a conclusion that type of

exposure Plaintiff alleges can cause GPA.[11]

Lane 2003 also examined potential associations between silica exposure and the

development of GPA. *See* Dkt. No. 162-1 ¶ 39; Dkt. No. 169-14 ¶ 39. This study found no

statistically significant increased risk of GPA, even in the group with high exposure. *See* Dkt.

No. 162-1 ¶ 40; Dkt. No. 169-14 ¶ 40. Lane 2003's findings with respect to primary systematic

vasculitis, which is a broader group than AAV, were based on an average exposure period of over

twenty years with a range exposure period of three to fifty years. *See* Dkt. No. 162-1 ¶ 41; Dkt.

No. 162-15 ¶ 54. Dr. Wang conceded that the occupations examined in Lane 2003 do not mirror

Plaintiff's work environment. *See* Dkt. No. 169-10 ¶ 58.

Webber 2015 examined potential associations between autoimmune diseases and

exposures at the World Trade Center site post 9/11/2001. *See* Dkt. No. 162-1 ¶ 42; Dkt. No. 169-

14 ¶ 42. This study contained only one case that reported having GPA. *See* Dkt. No. 162-1 ¶ 43;

Dkt. No. 169-14 ¶ 43. The authors did not draw any conclusions with respect to exposures at the

---

[11] In Defendants' statement of material facts, they assert that "[t]he occupations studied in Nuyts 1995 involve far higher silica dust exposures than Mr. Rizzo's alleged exposure and do not fit Mr. Rizzo's case." Dkt. No. 162-1 ¶ 38. Plaintiff responded as follows: "[d]eny to the extent that the studies do not involve far higher silica exposures than Mr. Rizzo's and do fit Mr. Rizzo's case." Dkt. No. 169-14 ¶ 38. Plaintiff then cited generally to Dr. Wang's declaration but gave no citation to a specific page or paragraph. As noted above, Dr. Wang conceded that the occupations studied in Nuyts 1995 "do not mirror Mr. Rizzo's work environment and exposure." Dkt. No. 169-10 ¶ 56. Accordingly, the Court deems Defendants' statement as admitted.

World Trade Center and the development of GPA.  *See* Dkt. No. 162-1 ¶ 45; Dkt. No. 169-14 ¶ 45.  Moreover, Dr. Miloslavsky conceded that no conclusions can be drawn with respect to GPA from this study.[12]  *See* Dkt. No. 162-4 at 54-56.

In sum, the studies that Dr. Miloslavsky relies on simply do not support his causation opinion.  Accordingly, Dr. Miloslavsky's causation opinion is inadmissible.

## B.  Defendants' Motion for Summary Judgment

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely

---

[12] Again, Plaintiff denied that "Webber 2015 is not sufficient to reach a conclusion linking exposures at the World Trade Center site with GPA." Dkt. No. 162-1 ¶ 46; Dkt. No. 169-14 ¶ 46. Plaintiff cited to Dr. Miloslavsky's testimony to support this denial. However, Dr. Miloslavsky testified that one cannot reach a conclusion based on a single case of GPA, and that the exposures in that study are not comparable to Plaintiff's. *See* Dkt. No. 162-4 at 54-56. Accordingly, the Court deems this statement as admitted.

on the moving party's statement of material facts; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

In the present matter, as mentioned above, Plaintiff has the burden of proving general causation, which requires him to "show that the toxin alleged to be the cause of the plaintiff's malady is capable of causing the type of injury alleged when a person is exposed to it in a concentration similar to that to which the plaintiff claims to have been exposed." *Green v. McAllister Bros.*, Nos. 02 Civ. 7588, 03 Civ. 1482, 2005 WL 742624, *11 (S.D.N.Y. Mar. 25, 2005) (citing *Mancuso*, 967 F. Supp. at 1445). Without the opinions of Dr. Wang and Dr. Miloslavsky, Plaintiff cannot point to any evidence in the record establishing that the exposures he alleges are capable of causing GPA. On the other hand, Defendants submitted testimony and reports from two qualified experts that GPA has no known cause. Since all of Plaintiff's remaining claims require him to establish general causation, Defendants are entitled to summary judgment.

In an attempt to survive the instant motion for summary judgment, Plaintiff argues that his exposure was not limited to silica, but included other solvents, chemicals, gases, ionizing radiation, and heavy metals. *See* Dkt. No. 169-13 at 16; Dkt. No. 35 ¶ 54. Plaintiff was free to offer a causation opinion with respect to any substance, but only offered opinions with respect to silica and TCE.[13] Plaintiff claims that Defendants' experts did not sufficiently address TCE and

---

[13] Plaintiff asserts that GlobalFoundries provided Plaintiff with a list of chemicals, substances, and gases that workers at the Fab 8 facility were potentially exposed to, but that the

(continued...)

nanosilica, but Plaintiff has the burden of proving general causation, and Plaintiff's experts have no scientific evidence to support their conclusion that these substances are capable of causing GPA. Furthermore, Defendants' experts opined that there are no substances known to cause GPA, and their opinions were based on numerous articles and studies. Accordingly, no matter how many substances Plaintiff alleges that he was exposed to in the amended complaint (or in the proposed second amended complaint), he has not established that any of these substances are capable of causing GPA.

Moreover, Plaintiff argues that his injury is not merely limited to GPA. *See* Dkt. No. 169-13 at 18-19. However, the Court agrees with Defendants that this case has always been about Plaintiff's GPA, and Plaintiff has not ever appeared to argue that the symptoms associated with GPA are distinct injuries themselves. *See* Dkt. No. 175 at 7-8. As Defendants point out, Plaintiff stipulated to a Phase I scheduling order which directed Phase I of discovery "to address general causation of plaintiff's alleged personal injury, [GPA] and its *associated symptoms*." Dkt. No. 56 at 1 (emphasis added). Moreover, Plaintiff's experts never opined that Plaintiff had any distinct injuries from his GPA itself. During the Workers' Compensation Board Hearing, Dr. Miloslavsky agreed that Plaintiff's "GPA condition explains most of, if not all of, [his] symptoms since the fall of 2012." Dkt. No. 175-5 at 3. Likewise, in Dr. Wang's declaration, he described Plaintiff's other ailments as "symptoms" of his primary diagnosis, GPA. *See* Dkt. No. 169-10 ¶ 20. As such,

---

[13](...continued)
list is not exhaustive. *See* Dkt. No. 169-13 at 17. It does not appear that either party attached this list to their motions, but Plaintiff attached a list containing over one thousand additional chemicals that he may have been exposed to. *See* Dkt. No. 169-5. In any event, Plaintiff has not been able to demonstrate that *any* substance is capable of causing GPA, and it appears from all the evidence in the record that the medical consensus is that GPA has no known cause.

Plaintiff may not proceed at this late stage in the case on the theory that his symptoms of GPA are distinct injuries.

Accordingly, since Plaintiff has failed to raise any genuine issue of material fact regarding general causation with respect to GPA, Defendants are entitled to summary judgment.

## C.     Plaintiff's Motion for Leave to File a Second Amended Complaint

As mentioned above, on December 20, 2016, the day before the deadline for filing summary judgment motions, Plaintiff filed a motion for leave to file a second amended complaint. *See* Dkt. No. 158. Plaintiff's proposed second amended complaint expands the time of his alleged exposure and adds additional exposures. *See* Dkt. No. 158-4 at 1. Specifically, Plaintiff alleges in the second amended complaint that his exposure period began in the spring of 2011, when he was "assisting with work in Global's Fab 8 facility," instead of May 2012.[14] *See* Dkt. No. 158-3 ¶¶ 33, 40. Plaintiff also seeks to add exposures to silica and nanosilica as part of his acute exposure on August 2, 2012, as well as chronic exposures to various substances, including trichloroethylene. *See id.* ¶¶ 37, 40-41. Moreover, when Plaintiff refers to GPA in the second amended complaint, he adds that GPA is an ANCA-associated vasculitis. *See id.* ¶¶ 54-55.

Rule 15(a) of the Federal Rules of Civil Procedure provides that, when a party needs the court's leave to amend a pleading, "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). "Amendments are generally favored 'to facilitate a proper decision on the merits.'" *Bay Harbour Mgmt., LLC v. Carothers*, 474 F. Supp. 2d 501, 502 (S.D.N.Y. 2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 48 (1957)). "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it

---

[14] Although Plaintiff alleges a longer exposure time, the Court notes that Plaintiff was laid off on January 13, 2012, and did not begin working for AMTS until May 2, 2012. *See* Dkt. No. 169-12 ¶¶ 20-21.

is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)) (other citations omitted). "Leave to amend may be denied for undue delay, bad faith, dilatory motive, prejudice to the opposing party, or the futility of the proposed amendment." *Bay Harbour*, 474 F. Supp. at 502-03 (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (other citation omitted).

Plaintiff claims that he did not unduly delay in bringing the current motion to amend. *See* Dkt. No. 158-4 at 3. Plaintiff contends that "any alleged delay has been slight, particularly since [P]laintiff was a *pro se* litigant for over a year and has only recently obtained counsel." *Id.* at 4. Plaintiff also contends that Defendants will not be prejudiced if the Court grants leave to amend. *See id.* at 4-5. Plaintiff argues that Defendants were put on notice of Plaintiff's proposed amendments in October 2016. *See id.* at 5. Plaintiff claims that the proposed amendments do not change the theory of the case or present new allegations that Defendants are unaware of. *See id.* Finally, Plaintiff contends that proposed amendment would not be futile. *See id.* at 6. Plaintiff argues that futility is determined by the motion to dismiss standard, and Plaintiff has already survived a motion to dismiss on the various claims that would be affected by this amendment. *See id.*

Defendants contend that Plaintiff unduly delayed in seeking leave to amend the complaint. *See* Dkt. No. 165 at 10-13. Defendants note that the motion for leave to amend was filed over four years after the events at issue occurred, approximately one month after discovery on general causation was completed, and only one day before motions for summary judgment were due. *See id.* at 10-11. Defendants also claim that they would be unduly prejudiced by such an amendment because they would have to redo much of discovery, as discovery largely focused on a three-month exposure period. *See id.* at 15-16. Finally, Defendants argue that the proposed

amendment would be futile. *See id.* at 18-21. Defendants contend that futility should be evaluated by the summary judgment standard in this case, as discovery has already been completed. *See id.* at 18. Defendants argue that the amendment would be futile because "no substance, *at any duration of exposure*—has been demonstrated to cause GPA." *Id.* at 19.

With respect to undue delay, it does appear that Plaintiff and his attorneys had knowledge of the additional facts that Plaintiff seeks to allege several years before the proposed amendments. However, "[m]ere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend." *Ramos v. O'Connell*, 169 F.R.D. 260, 262 (W.D.N.Y. 1996) (quotation omitted). Accordingly, the Court will consider whether Defendants would be unduly prejudiced if the Court grants Plaintiff leave to amend.

In assessing whether a proposed amendment constitutes prejudice, "the Second Circuit considers whether the assertion of the new claim would: '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the [opposing party] from bringing a timely action in another jurisdiction.'" *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, 215 F.R.D. 105, 107 (S.D.N.Y. 2003) (quoting *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993)).

In the present matter, as Defendants note, general causation requires a showing that a substance is capable of causing a particular disease "in relevant circumstances." *In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 438 (S.D.N.Y. 2005). Accordingly, if the Court were to grant Plaintiff's motion, Defendants would have to redo at least parts of the depositions to focus on a longer exposure period. Likewise, Defendants' experts would have to amend portions of their expert reports. Defendants would also have to file another motion for summary judgment after the conclusion of this additional discovery, despite already having filed one. Granting such

an amendment would also significantly delay the resolution of this matter, as the Court has determined that Defendants are entitled to summary judgment. *See Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998) ("One of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action.") (quotation omitted); *see also Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) ([P]ermitting [a] proposed amendment . . . [is] especially prejudicial . . . [when] discovery had already been completed and [the non-movant] had already filed a motion for summary judgment."). Accordingly, Defendants would suffer undue prejudice if Plaintiff's motion was granted.

The Court also finds that the proposed second amendment would be futile. At the outset, "[o]rdinarily, leave to amend may be denied on the basis of futility if the proposed claim would not withstand a Rule 12(b)(6) motion to dismiss." *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 403 (S.D.N.Y. 2014) (citation omitted). "However, when the motion to amend is filed after the close of discovery and the relevant evidence is before the court, a summary judgment standard will be applied instead." *Id.* (citing *Huber v. Nat'l R.R. Passenger Corp.*, No. 10 Civ. 09348, 2012 WL 6082385, *5 (S.D.N.Y. Dec. 4, 2012)) ("[W]here the Court is asked to review a proposed amendment with the benefit of a full discovery record, a futility analysis is still possible, but it will then turn on the question of whether the proposed amended complaint would be subject to dismissal under Rule 56 of the Federal Rules of Civil Procedure for lack of a genuine issue of material fact.") (other citations omitted); *see also Azurite Corp. v. Amster & Co.*, 844 F. Supp. 929, 939 (S.D.N.Y. 1994) ("[The plaintiff's] proposed amendment would be futile because the factual foundations of [the plaintiff's] new allegations are insufficient, as a matter of law, to withstand defendants' motion for summary judgment."). Here,

since discovery on general causation has been completed and the relevant evidence is before the Court, the proper standard to determine futility is whether Plaintiff's proposed amendments could survive Defendants' summary judgment motion.

Even with Plaintiff's proposed amendments, Dr. Wang's testimony would still be inadmissible as it is not reliably based on any kind of scientific evidence whatsoever. The three studies that Dr. Wang relies on, Napierska 2012, Cooper 2009, and Miller 2012, which the Court discussed above in great detail, still do not support a finding that nanosilica or TCE are capable of causing Plaintiff's GPA, even with the added exposure time in the proposed second amended complaint. Moreover, as discussed above, to the extent that Dr. Wang offers a causation opinion that is not based on those articles, he has absolutely no scientific evidence to support such an opinion.

With respect to Dr. Miloslavsky, the proposed second amended complaint does nothing to cure the fact that Dr. Miloslavsky's opinion is unreliable as he selectively chose the literature in which he relied upon. Moreover, the studies discussed by Dr. Miloslavsky still do not support a finding that Plaintiff's alleged exposures are capable of causing GPA, even with the additional allegations in the second amended complaint. Dr. Wang concedes that the studies relied upon by Dr. Miloslavsky do not mirror Plaintiff's work environment and type of exposure. *See* Dkt. No. 169-10 ¶¶ 56-58, 61, 65. Similarly, as discussed above, the studies cited by Dr. Miloslavsky that did find positive associations were based on significantly longer exposures and latency periods than Plaintiff alleges, even in the second amended complaint.

Accordingly, even with the proposed amendments, Plaintiff cannot point to any scientific evidence suggesting that his alleged exposures are capable of causing GPA. As Defendants' experts contend, GPA has no known cause, and Plaintiff has failed to offer any evidence to refute

this. *See* Dkt. No. 162-18 ¶ 5; Dkt. No. 162-15 ¶ 9. Plaintiff's proposed amendments do nothing to cure this deficiency. As such, Plaintiff's motion for leave to file a second amended complaint is denied.

### D.    Plaintiff's Objections to Magistrate Judge Baxter's Order

As explained above, in a Text Order dated November 30, 2016, Judge Baxter reduced the amount that Dr. Wang could charge Defendants for his depositions. *See* Dkt. No. 156. Plaintiff filed objections to that order, claiming that Judge Baxter committed clear error by inappropriately assessing Dr. Wang's level of expertise, by not allowing Plaintiff to respond before issuing the order, and by not addressing the relevant factors that courts should consider when determining the reasonableness of expert fees. *See* Dkt. No. 157-1 at 2-4.

"When a party submits objections to a magistrate judge's non-dispositive order, the district court must review the objections and 'modify or set aside any part of the order that is clearly erroneous or is contrary to law.'" *Advanced Analytics, Inc. v. Citigroup Glob. Markets, Inc.*, 301 F.R.D. 47, 50 (S.D.N.Y. 2014) (quoting Fed. R. Civ. P. 72(a)); *see also* 28 U.S.C. § 636(b)(1)(A). "A decision is clearly erroneous where 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Gualandi v. Adams*, 385 F.3d 236, 240 (2d Cir. 2004)). "An order is 'contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure.'" *Id.* (citation omitted).

To determine whether an expert fee is reasonable, courts consider the following:

> (1) the witness' area of expertise; (2) the education and training that is required to provide the expert insight that is sought; (3) the prevailing rates for other comparably respected available experts; (4) the nature, quality and complexity of the discovery responses provided; (5) the cost of living in the particular geographic area; and (6) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26. In addition, courts look to (1) the fee actually being charged to the party who retained

the expert; and (2) fees traditionally charged by the expert on related matters.

*Mathis v. NYNEX*, 165 F.R.D. 23, 24-25 (E.D.N.Y. 1996) (internal citations omitted).

In the present matter, the Court finds no clear error in Judge Baxter's Text Order. Although Judge Baxter did not explicitly analyze the *Mathis* factors in the order, it is clear that he considered them in setting a reasonable fee. Judge Baxter noted that Dr. Wang lacks specific expertise in the areas in which he provided medical opinions, and this Court has already discussed Dr. Wang's utter lack of expertise in these areas. At the time of the first deposition in August 2016, Dr. Wang testified that he was unemployed. *See* Dkt. No. 155-1 at 19. At his second deposition in November 2016, Dr. Wang was contracting with St. Peter's Hospital on a part-time basis for $235 per hour. *See id.* at 80. In sum, after carefully reviewing the factors, the Court finds that Judge Baxter's order setting Dr. Wang's hourly rate at $235 was far from clearly erroneous or contrary to law.

Moreover, it was not clear error for Judge Baxter to reduce the total number of hours for which Dr. Wang could be compensated. Judge Baxter concluded that Dr. Wang could not be compensated for certain preparation time that instead involved a literature review which he used to formulate his opinions. *See* Dkt. No. 156. The Court agrees with Judge Baxter that the original preparation time claimed was excessive.

Accordingly, the Court finds no clear error in Judge Baxter's order setting a reasonable fee for Dr. Wang's deposition testimony, and Plaintiff's objections are denied.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's objections to Magistrate Judge Baxter's Order (Dkt. No. 157) are **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion for leave to file a second amended complaint (Dkt. No. 158) is **DENIED**; and the Court further

**ORDERS** that Defendants' motion to exclude Plaintiff's expert's causation testimony (Dkt. No. 161) is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 162) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 11, 2017
      Albany, New York

Mae A. D'Agostino
U.S. District Judge